```
| 207     59|
|s207     70|
```

# Stewart, Appellant, *v*. Stewart.

*Husband and wife—Principal and surety—Mortgage—Judgment.*

If the land of a wife is mortgaged for a husband's debt, a subsequent judgment creditor of the husband cannot claim that the mortgagee shall proceed first against the property of the wife, nor can he claim to be subrogated to the mortgagee's security against the wife. The wife is but a surety to the mortgagee for the husband.

Where a husband largely indebted to a bank of which he is president borrows a sum of money and applies it to the payment of his debt, and his wife who owes no part of the debt and is in no way responsible, delivers to the lender to make him safe her individual note secured by bank stock, and also her bond joined in by her husband which bond is secured by a mortgage on her separate real estate, the wife is a surety for the debt of her husband.

While there is a strong sentiment of affection growing out of the marital relation which would induce a wife to do that for her husband which she would do for no other, yet her acts as between her and his creditors are governed by the same rules of evidence that operate in transactions between others. She stands on exactly the same footing as all the other creditors of her husband.

*Equity—Moral obligations—Husband and wife—Husband's relatives.*

Equity cannot assume control over that large class of obligations resting on conscience and moral duty only, unconnected with legal obligations.

There is no legal obligation on a wife to permit the appropriation of her separate estate to the payment of the debt of her husband to his brothers and sisters, however imperative may have been the obligation on him.

Argued March 9, 1903. Appeal, No. 79, Jan. T., 1902, by plaintiff, from order of C. P. Northampton Co., March T., 1897, No. 33, dismissing exceptions to auditor's report in case of Margaret K. Stewart et al. *v*. Edward F. Stewart. Before MITCHELL, DEAN, BROWN and MESTREZAT, JJ. Reversed.

Exceptions to report of James W. Wilson, Esq., auditor.

The facts are stated in the opinion of the Supreme Court.

*Errors assigned* were in sustaining exceptions to auditor's report.

*F. W. Edgar*, for appellant.

*Edward J. Fox* and *H. J. Steele*, for appellee.

OPINION BY MR. JUSTICE DEAN, October 12, 1903 :

An auditor was appointed by the court below to distribute the fund in court arising from sale by the sheriff of certain real estate of Edward F. Stewart.   He heard all the parties interested in the fund and made report of distribution to those who in his opinion were entitled to the same.   On his report coming into court, exceptions were filed by S. L. Fisler, trustee.   After hearing the exceptions the learned judge of the court below sustained the material ones, overruled the auditor and directed distribution of the fund in accordance with his own opinion.   We have now three appeals from decree of the court, Nos. 78, 79 and 80, January term, 1902, by Laura S. Lachenour, executrix of Margaret K. Stewart.   Practically the same facts and the same conclusions of law are the subject of contention in all of them and it has been agreed by counsel to argue together here all three appeals.   And while it is necessary that we should formally enter judgment here in each, we shall say all we have to say in No. 79, the appeal to which the auditor's report and the opinion of the court below are appended.

It seems to us the material facts, on which are founded the conclusions of the auditor and those of the court, are about the same ; while they differ widely in their inferences from them, they do not differ greatly as to the essential facts.   We shall endeavor to state what to us seem the material facts and then give our conclusions from them.

Margaret K. Stewart was the wife of Edward F. Stewart ; she owned land on Northampton street, Easton and her husband on Second street in the same city.   The husband was president of the First National Bank of Easton, and was indebted to the bank on notes and overdrafts ; he was also indebted to one Henry Fulmer who was vice president of the bank.   On December 27, 1893, at the suggestion of Fulmer and on request

of her husband, she joined her husband in a bond to Fulmer in the sum of $11,000, and delivered to him a mortgage on her separate property on Northampton street to secure the bond. The bond and mortgage were prepared by Fulmer, and after being executed were delivered to him by the husband. Fulmer at once recorded the mortgage and entered judgment on the bond the same day, the 27th of December, 1893. At the time, the wife was the owner in her own right of 103 shares of the capital stock of the bank; on the same day the bond and mortgage were delivered, she made and delivered to Fulmer her note at four months for $7,500, and placed in his hands as collateral security for the note, the 103 shares of bank stock. The amount thus raised on the mortgage of the wife's real estate and on her note secured by the pledge of her bank stock was about $18,500, which was at once placed to the credit of the husband at the bank. He had become largely indebted to the bank some three years before by reason of indorsements for his son-in-law, Henry M. Baum, which had been taken up by Stewart, the father-in-law, with his own note in sum of $16,000. Outside of this note his indebtedness to the bank was considerable. Some of the directors of the bank, among them Fulmer, were pressing for payment or security. Fulmer furnished individually this $18,500, and at the time it was understood between the husband, wife and Fulmer, that the money was to be applied at the bank in part payment of the husband's indebtedness, and especially to the payment of the $16,000 note, the consequence of the Baum indorsements. The note was placed to the credit of the husband's account in the bank; the $16,000, note, was paid as intended and some smaller sums connected with transactions with Fulmer, leaving a balance in the husband's favor out of the money received from the wife of over $2,000 which was subsequently appropriated to other indebtedness of the husband.

The mortgage was the first lien on the wife's land; the judgment entered on the bond was the first lien on the husband's land. Three days after the recording of the mortgage and entry of the judgment, Samuel L. Fisler, trustee, etc., for brothers and sisters of the husband, recorded a mortgage on the land of the husband, given to secure the payment to his brothers and sisters of $6,425.55; twenty-five days after

that, Fulmer entered a judgment note in his favor given
by the husband for $5,500. This made three liens in the
order mentioned on the land of the husband, and one lien,
the mortgage of $11,000 on the land of the wife, which sum
by entry of judgment on the bond was also the first lien on
the land of the husband. So far as the record shows, no
attempt to enforce collection of either lien was made for
about three years; the husband during this interval paid
the interest on the mortgage and the discounts for renewals
of the note secured by pledge of his wife's bank stock. But
in January, 1897, Fulmer issued execution on his $5,500
judgment against the husband, this in order of entry, being
the third lien against him, sold his personal property, includ-
ing his individual bank stock, thereby disqualifying him from
office in the bank; renewal of the wife's note was refused
and her bank stock sold, the proceeds credited on the note,
and suit brought against her to recover the balance with in-
terest. The issue in the suit was tried before Judge YERKES
specially presiding, who found the facts from the evidence
without a jury. The wife defeated recovery, on the ground,
that she was a mere surety for her husband and, therefore,
under the act of 1893, was not liable for that debt. Subse-
quent to the entry of Fulmer's judgment against the husband,
a mechanic's lien for a small amount was filed against a build-
ing on the Second street property, making a fourth lien. Then
on the 2d of February, 1897, the wife obtained judgment
against her husband for $3,175.25, which made the fifth lien.
On this judgment she issued execution, levied upon and sold
the husband's land to William Laubach, for $7,000. Before
this sale Fulmer filed a release of the lien of his $11,000 judg-.
ment, which on the record stood as the first lien; but this
release Stewart and his wife refused, of record, to accept. Fis-
ler, trustee, however, treating the release as effective, and his
mortgage as being consequently the first lien, issued sci. fa.
upon it. This was defended against by Laubach, the purchaser,
on the ground that the release filed by Fulmer, not having been
assented to by the husband and wife, the judgment for $11,000
was a subsisting lien at the date of the sale by the sheriff, on
the wife's judgment, and therefore, the subsequent mortgage
of Fisler was discharged. The trial court concurred in this

view and judgment went for defendant, which judgment on appeal to this court, see Fisler v. Stewart, 191 Pa. 323, was affirmed. Fulmer now issued sci. fa. on his mortgage against the wife's land on Northampton street; she defended to the extent of claiming that the net proceeds of the sheriff's sale of her husband's property on Second street was a payment on the judgment bond the mortgage was given to secure, and, therefore, that amount, $6,921.07, should be credited on the mortgage.

The trial court, Judge YERKES presiding, overruled the defense and judgment was entered against the wife on the mortgage, which was a lien upon her land, for the full amount, with interest, $13,995.01. On this judgment lev. fa. was issued and the wife's property on Northampton street sold for a sum considerably in excess of all liens. The court below indicated that the excess should, in equity, go to Fisler, owner of the second lien on the land of the husband, that is, he should be subrogated to Fulmer's right on the fund realized from the wife's mortgage. It is not necessary to inquire at this point into the soundness of his suggestions on this question, if Margaret K. Stewart has established a legal or equitable right to the surplus over and above all liens against her property. However meritorious may be the claims of the beneficiaries of the Fisler mortgage on the property of the husband, what is clearly the wife's property could not be appropriated in payment, unless there was an equity on their part superior to hers. It does not help us to discuss what might have been decided in Fisler, Trustee, v. Stewart, supra, if this case had then been before the court; it clearly and unmistakably decides what was before it, and that is, that the plaintiff in a judgment cannot, against the objection and protest of the defendant, release his lien to the prejudice or supposed prejudice of defendant. The decision settles that Fulmer's $11,000 judgment was the first lien against the husband's property; and that being the case, the $7,000 purchase money, made by a sale of the husband's land on a subsequent judgment, must be credited, less costs on the $11,000. This, on the assumption that the wife ought to be treated as a surety in that judgment; if she was not a surety, then Fulmer having a lien on two properties, the husband's and the wife's, must in equity go upon

the wife's property to the point of exhausting it before he can
claim all the money realized from a sale of the husband's prop-
erty, for Fisler has only a lien upon the one property, the
husband's. Therefore, the result depends upon the answer
to the single question, was the wife a surety for the husband
on the bond accompanying the mortgage? This is how the
auditor answers the question:

"Under all the evidence before the commissioner, and the
law applicable thereto, Margaret K. Stewart, with respect to
her Northampton street property, bound by the mortgage for
$11,000, occupies the equitable relation of surety for the bond
accompanying the mortgage, entered as the first judgment lien
of record on the Second street property of her husband, Edward
F. Stewart, at the time of the sheriff's sale. She has all the
rights of a surety growing out of the equitable relationship
between the respective pieces of land. She has the right to
require that the proceeds of her husband's land, sold under
execution, be applied upon the indebtedness under the $11,000
judgment to Henry Fulmer, in relief of her own land, and
discharge pro tanto of the mortgage."

And, without his very full and persuasive reasons therefor,
this is how the question is answered by the learned judge of
the court below:

"The mortgage was not given as collateral to a subsisting
debt of the husband, but to be used towards paying off his debt
and became a debt of her own. Her attitude throughout was
different towards this liability from her position towards the
$7,500 note. The whole transaction rebuts any idea of surety-
ship, and there is evidence sufficient to overcome any such pre-
sumption which, in the first instance, might prevail."

This conflict throws upon us the decision of the controlling
fact, the suretyship, not the equity of a surety, for that has
been firmly settled and there is no real variance in the authori-
ties.

Let us first notice the attitude of the three parties to the
transaction when they are first brought together. The husband
owes money to the bank of which he is president and Fulmer
vice president and director; his indebtedness to the bank is
large, a great deal larger, perhaps, than was consistent with pru-
dent banking or a fair definition of duty on the part of the

bank's officers; the husband has some real estate of his own, but not nearly enough to pay his indebtedness; a forced immediate sale of it would not discharge the indebtedness, besides would bring discredit on the bank and odium on its officers; both Fulmer and the husband were anxious to avoid such a result; the husband wanted to save his position and salary as president and Fulmer his as vice president, as well as their own good name and the credit of the bank. Fulmer had ample means of his own individually; the debtor's wife had considerable estate of her own in land; but she did not owe the bank one cent, nor was she in any way answerable for the indebtedness of her husband. While the husband's estate was within reach of the bank, hers was not; if she could be induced by the pressing nature of the exigency to pledge her estate as additional security for her husband's indebtedness, the bank and its officers would be relieved from a serious responsibility. Besides, more than doubling the securing of the bank, time could be given the debtor and the two obligors might reasonably expect with good management to realize in some way on one or the other of the estates, perhaps both, far more than sufficient to discharge the indebtedness.

It is immaterial that the bond and mortgage were not made directly to the bank; it was the express understanding of all the parties, that if Fulmer made the loan and took the security in his own name, all the money furnished was to be paid the bank, to be by it applied in payment of the husband's indebtedness; and it is immaterial whether the proposition was made directly by Fulmer to the wife or conveyed to her by her husband; it was suggested by Fulmer and no other, with the disagreeable alternative, that if not accepted the husband would lose his situation in the bank.

The proposition in substance was that Fulmer would loan her $7,500 on her individual note with her bank stock as collateral, and $11,000 on the joint bond of herself and husband, the latter to be secured by a mortgage on her separate real estate. After considerable reluctance she acceded to the proposition, executed and delivered the papers to Fulmer, received the money, had it placed to the credit of her husband in the bank where it was applied in payment of a large part of his indebtedness.

She testified that her purpose in accepting the proposition was to save her husband's position in the bank; on motion of Fulmer's counsel the court struck out this answer as irrelevant. We doubt the correctness of the ruling, but eliminate the answer, and how stands the case? For the purpose of paying a debt of his own a husband borrows nearly $18,000 and applies it in payment of his debt; his wife who owes no part of it and is in no way responsible delivers to the lender to make him safe her individual note secured by her bank stock for $7,500, also her bond joined in by her husband for $11,000, the last secured by a mortgage on her separate real estate.

While there is a strong sentiment of affection growing out of the marital relation which would induce a wife to do that for her husband which she would do for no other, yet her acts as between her and his creditors are governed by the same rules of evidence that operate in transactions between others. She stands on exactly the same footing as all the other creditors of her husband; the same evidence which would establish a stranger's right will establish hers, except as to the income of her separate estate; there the receipt of such income by the husband without objection on her part is presumptively a gift to the husband instead of a loan. In the case before us, the question is, was she surety to Fulmer for the husband's debt? Suppose instead of the wife, a mere friend had come to the help of the husband in his extremity; had joined the husband in a bond, had mortgaged his own land to secure the bond; then this money had been handed to the husband and he with the money had paid his debt of which his friend owed nothing. From these facts without more, the presumption would be, that the friend was a surety; it would require very strong evidence to rebut the presumption. The wife is in no less favorable position, so far as concerns proof, than the friend. The motive to impel her to become surety to the husband's creditors may be stronger, but the rules of evidence impose upon her no heavier burden in establishing her suretyship than upon any other creditor.

It seems to us, the court below gave too little weight to the undisputed facts which we have just noticed establishing the presumption and too much significance to extraneous facts as rebutting the presumption. That $16,000 of the debt of the

husband had been contracted by indorsements for the son-in-law is not important; this debt had been paid by the husband three years before and the son-in-law no longer had any connection with it; he was entirely out of the transaction and received no benefit through the money borrowed from Fulmer. Nor is it important that she took no obligation or writing at the time from her husband showing that she was surety; it would have been somewhat out of the common course of wives, if she had done so. The court lays considerable weight on the testimony of the wife to the effect that the giving of the note, as well as the bond and the mortgage was her own transaction, and consequently that the debt was her own. We think, taking the whole of her testimony, her meaning was clearly the contrary. She had just said in her testimony that she did not owe one cent to Fulmer; that he had made out to her order the check for the money, that she indorsed and gave it to her husband, she thinks, to hand to the bank; that the proposition to pledge her bank stock and mortgage her land was brought from Fulmer by her husband; then in answer to the question, " Did you or did you not make this mortgage and pledge your stock for a transaction of your own? " she answers, she did the transaction herself for the purpose solely of securing her husband's position in the bank. This answer, on objection, was immediately stricken out. Then follows the question, " Did you or did you not make this mortgage and pledge your stock for a transaction of your own? " Ans. " Yes, it was my own transaction." Then after several other questions comes this one, " Now in regard to this mortgage and pledge of your stock, was it for your own benefit and sake or not? " Ans. " Not at all." Obviously her meaning by the language " I did the transaction myself " is that physically, she signed and delivered the note, mortgage and bonds, and not that the negotiations for the loan and the payment of her husband's debt was her transaction. Of course the transaction was hers as far as concerned the execution and delivery of the papers; neither Fulmer nor her husband could do that for her, and this was all she meant by her answer.

And so with all of the facts, which in the opinion of the court below, tended to rebut the presumption of suretyship. We think, taking them all together, they are not of sufficient

weight to overcome the inevitable presumption, that arises from the wife's pledging her separate property to secure her husband's debt, at the solicitation of the debtor and the lender, followed by the application of the money in payment of that debt. Therefore, we think the case is flatly ruled by the late case of Zeller v. Henry, 157 Pa. 1, that " If the land of a wife is mortgaged for a husband's debt, a subsequent judgment creditor of the husband cannot claim that the mortgagee shall proceed first against the property of the wife, nor can he claim to be subrogated to the mortgagee's security against the wife. The wife is but a surety to the mortgagee for the husband." This only follows a long line of our own decisions most of them cited in this case. Indeed, practically, there is no contention as to the law; the learned judge of the court below says : " The evidence is sufficient to satisfy us, that the proofs preponderate over the presumption of a loan and that justice and equity require us to find that the presumption of a suretyship should not prevail."

The court below in its view of the evidence bearing on the question of the wife's suretyship seems to have been strongly moved by an assumed equity, that it thought ought to be enforced in favor of the beneficiaries under the Fisler mortgage, which equity could only be reached by finding as a fact, that the mortgage of the wife's land was neither a loan nor a contingent pledge for the husband's debt but a gift of her land to him. Swayed somewhat, perhaps, by what he deemed a superior equity in the beneficiaries of the Fisler mortgage to be paid their debt out of the brother's land, he fails to give full effect to the evidence and law in favor of the wife's claim. While equity " is the correction of that whereof the law by reason of its universality is deficient," yet it must be noted that the law was in no way deficient in settling the status of record. It determined that the Fulmer judgment was the first lien and that he under the circumstances without the consent of defendants could not release it ; the purchase money paid by Laubach must then, necessarily, be appropriated to it. It is true, that if Fulmer had access to two funds, the wife's as well as the husband's equity might subrogate the junior creditor's to Fulmer's right against the wife's estate ; but this brings us right back to the question, was the wife a surety ? We find that she clearly

was; while we concede the hardship to the Fisler beneficiaries in the loss of their money which the husband should have paid them, the hardship is not all on one side.  The wife subjected her estate to the payment of the debt of her husband and had lost it all except this relatively small part, which will only be saved by a credit of the Laubach purchase money on the judgment against her and her husband.  We do not see in any view of the evidence that the Fisler mortgage has any equity superior to hers; she is the wife; the Fisler mortgage represents the debt of the debtor's brothers and sisters.  Story (Equity Jurisprudence) says, "Equity cannot assume control over that large class of obligations, resting on conscience and moral duty only, unconnected with legal obligations."  As we have shown, there is no legal obligation on the wife to permit the appropriation of her separate estate to the payment of the debt of her husband to his brothers and sisters, however imperative may have been the obligation on him.  There are some moralists, it is true, who, refining on social ethics, do hold, that it is the moral duty of the wife to surrender her estate not only to the husband's creditor kindred but also to his creditors generally; but there is no such rule of equity or law in Pennsylvania.  In the early case of Tate v. Austin, 1 P. Williams, 264, it was held that the wife ought to be postponed to all other creditors, but the doctrine never obtained a foothold in England and never had existence in this country.  There is no such rule in equity; if it has any real foundation in ethics, it is only one of those imperfect obligations over which equity, as mentioned by Justice STORY, will not assume control.  So far as we notice, there was no superior moral obligation or duty on the part of the wife to her husband's relatives which ought to have moved her to relinquish her rights for their benefit.  Taking the whole evidence, we do not think that in any view of it, it is sufficient to rebut the presumption of the wife's suretyship, therefore the decree of the court below is reversed, and it is directed that the balance, $6,450.56, be credited on the judgment of Henry Fulmer v. Edward F. Stewart and Margaret K. Stewart, No. 109, December term, 1893.